## THE BISMARCK.

(District Court, S. D. New York. April 16, 1923.)

**Collision ☞71 (2)—Tug held solely in fault for collision for failure to keep proper lookout.**

A tug moving up the Hudson with a coal barge in tow alongside, on a clear day, *held* solely in fault, for failing to keep a proper lookout, for collision with a mud dumper, one of two composing the tow of another tug, which was not on any course, but engaged in making up her tow.

In Admiralty. Suit for collision by the Berwind-White Coal Mining Company, owner of the tug Windber, against the steam tug Bismarck; the Cahill Towing Line, Inc., claimant. Decree for claimant. Decree affirmed 297 Fed. 841.

Macklin, Brown & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for libelant.

Foley & Martin, of New York City (W. J. Martin, of New York City, of counsel), for claimant.

WARD, Circuit Judge. December 23, 1919, about 11 a. m. on a clear day, with little flood tide, and no other shipping to embarrass them, the tug Windber, with the coal-laden scow Eureka No. 72 on her starboard side, came into collision about amidships with the port upper corner of a mud dumper on the port side of the tug Bismarck.

The master of the Windber says that he was going up about the middle of the North River, bound to Pier 58, and saw the Bismarck coming diagonally across the river for New York, about 100 feet off the coal pier at Nineteenth street, Weehawken, with two boats, one behind the other, on his port side. He blew a signal of one blast and ported a little, which not being answered he ported more, expecting to clear; but, the Bismarck continuing to come on without change of course or speed, collision happened as described above. He says he looked in the pilothouse of the Bismarck, and there was no one there, though some one came into it from aft after the collision. The mate, who was in the pilothouse, and the captain of the steam tug Mahoney corroborate this account.

The master of the Bismarck says that he backed out with two mud dumpers abreast from the south side of the coal pier at Nineteenth street, Weehawken. A line ran from the bow of the tug to the inside dumper, and as they were backing out the outside dumper swung around under the stern of the other. When about 600 feet out he took in his head line, rounded to alongside the forward dumper on

his port side, stopped his engines, and passed the intermediate hawser from the tug across the deck of the forward dumper to the bow of the after dumper, where it was coiled up. An intermediate hawser is used to single out the dumpers when they reach the Narrows. The master says he was aft on the upper deck superintending this operation, which took from 10 to 15 minutes, and the mate was sitting in the pilothouse. When the collision occurred, the captain walked forward into the pilothouse. The mate, engineer, deck hands of the tug, and the masters of the dumpers corroborate this account.

Liability depends upon which story is believed. I adopt the Bismarck's account because it is much more likely that the Windber kept a bad lookout than that a tug was allowed to proceed down the North River wild, with no one in the pilot house; and, second, because I am satisfied that the dumper tow was made up as the Bismarck's witnesses describe, which is the usual way, that it takes from 10 to 15 minutes to pass over the intermediate hawser, and that the Windber could not have seen the Bismarck coming out from the coal pier with the tow already made up, as her witnesses say.

The case was one of special circumstances under article 27 of the Inland Regulations of 1897 (Comp. St. § 7901); the Bismarck not being on any course, but standing still making up her tow, at the time of the collision. Article 19 (section 7893) does not apply. The Windber could have avoided the collision without the least trouble, had she kept a proper lookout.

The libel is dismissed.